## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DEFENDERS OF WILDLIFE**,<br>1130 17th Street N.W.<br>Washington, D.C. 20036,<br><br>and<br><br>**WYOMING WILDLIFE ADVOCATES**,<br>P.O. Box 1772<br>Wilson, WY 83014<br><br>        Plaintiffs,<br><br>v.<br><br>**SALLY JEWELL**, Secretary,<br>U.S. Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C. 20240,<br><br>**JONATHAN B. JARVIS**, Director,<br>National Park Service<br>U.S. Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C. 20240,<br><br>and<br><br>**SUE MASICA**, Regional<br>Director, National Park Service Intermountain<br>Region<br>12795 Alameda Parkway<br>Denver, CO 80225<br><br>        Defendants. | Civil Case No. 16-553 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      This case challenges a November 2014 determination by the National Park Service (the "Park Service") that the agency is powerless to protect wildlife on state- and privately owned lands within the boundaries of Grand Teton National Park ("Grand Teton" or the "Park").  See Letter from T. Whittington, Assoc. Reg'l Dir. of Res. Stewardship & Science, Nat'l Park Serv., to B. Nesvik, Wildlife Div. Chief, Wyo. Game & Fish Dep't (Nov. 11, 2014) ("Whittington Letter").  That determination, which ceded authority over wildlife on the roughly 2,300 acres of non-federal "inholdings" within Grand Teton to the State of Wyoming, represents an abrupt reversal of the Park Service's longstanding interpretation that its wildlife-protection regulation, 36 C.F.R. § 2.2, applies and prohibits hunting, trapping, or harassing of wildlife on all lands within Grand Teton National Park "regardless of land ownership."  Id. § 2.2(g).  The Park Service's determination leaves numerous wildlife species for which Grand Teton has served as a vital sanctuary—from bison and antelope to black bears and mountain lions—vulnerable to hunting, trapping, or baiting under Wyoming law should they cross the generally invisible boundaries that separate federally owned Park lands from inholdings.  The Park Service's action also gives rise to the prospect that visitors to Grand Teton will witness the killing of animals they came to the National Park to witness in the wild.

2.      Congress did not grant the Park Service discretion to bargain away its power to protect wildlife within our National Parks.  The Park Service's decision to surrender its wildlife-protection authorities on Grand Teton inholdings violates the Park Service's wildlife-protection regulation itself, 36 C.F.R. § 2.2, as well as the National Park Service Organic Act, 54 U.S.C. § 100101, et seq.—Congress's charter for stewardship of the National Parks—and the enabling legislation for Grand Teton, 16 U.S.C. §§ 406d-1 – 406d-5, 673c.  These authorities charge the

1

Park Service with an unequivocal mandate to protect wildlife within Grand Teton National Park and require the Park Service to exercise the full scope of federal authority in service of that mandate. Contrary to the Park Service's tacit assumption in the Whittington Letter, well-established federal authority exists to regulate the taking of wildlife on all lands within the boundaries of Grand Teton National Park. The Park Service's voluntary divestment of that authority violates the agency's mandate under the cited regulation and statutes.

3.    As a consequence of the Whittington Letter, numerous wildlife species within Grand Teton National Park are now subject to unlimited killing on the inholdings pursuant to Wyoming law, and Wyoming has exercised its discretion to authorize regulated hunting of additional species—so far elk, bison, and mule deer—on Park inholdings. The State is empowered to authorize the killing of additional species on the inholdings, including gray wolves and grizzly bears in the event their Endangered Species Act protections are removed. To safeguard Grand Teton's incomparable wildlife and preserve the integrity of one of the crown jewels of our National Park System, plaintiffs seek relief from this Court.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02. Plaintiffs bring this action pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, which waives defendants' sovereign immunity, see id. § 702.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because defendants Sally Jewell and Jonathan B. Jarvis reside in this District and plaintiff Defenders of Wildlife is headquartered in this district.

**PARTIES**

6.      Plaintiff Defenders of Wildlife ("Defenders") is a national nonprofit conservation organization headquartered in Washington, D.C., with more than 388,000 members across the country.  Defenders is a science-based advocacy organization focused on conserving and restoring native species and the habitat on which they depend, and has been involved in such efforts since the organization's establishment in 1947.  Over the last three decades, Defenders has played a leading role in the protection and recovery of wolves, grizzly bears, bison, and other wildlife species throughout the northern Rockies, including in Grand Teton National Park.

7.      Defenders and its members have long-standing interests in the preservation and recovery of native wildlife species throughout the northern Rockies, including in Grand Teton National Park, because Defenders and its members place a high value on these wildlife species and because the presence of these species is essential to the healthy functioning of the ecosystems in which they evolved.  Defenders actively seeks to protect and recover wolves, grizzly bears, bison, and other species throughout the northern Rockies, including in Grand Teton National Park, through a wide array of actions including public education, scientific analysis, and advocacy intended to promote achievement of healthy ecosystem functioning in the region.  Defenders' members, staff, and volunteers use public land throughout the northern Rockies, including in Grand Teton National Park, for recreational pursuits, wildlife viewing, and aesthetic enjoyment.  Defenders' members, staff, and volunteers seek to view wolves, grizzly bears, bison, and other wildlife species throughout the northern Rockies, including in Grand Teton National Park.

8.      Plaintiff Wyoming Wildlife Advocates ("WWA") is a non-profit conservation organization based in Wilson, Wyoming, just outside the boundaries of Grand Teton National

park.  WWA was founded in October 2014 to promote science-based wildlife management that fosters ecosystem health and dynamic equilibrium between species within Wyoming and the Greater Yellowstone Ecosystem, including Grand Teton National Park.  WWA and its staff actively participate in the conservation of wildlife species in Grand Teton and the Greater Yellowstone Ecosystem by submitting comments on state and federal land- and wildlife-management decisions and participating in other public engagement opportunities surrounding these decisions.  WWA promotes public awareness and understanding of regional wildlife issues through its newsletter and social and earned media.

9.      WWA staff and supporters frequent Grand Teton National Park, including publically accessible non-federal inholdings and federal lands adjacent to inholdings, for recreational pursuits, wildlife viewing, wildlife photography, and aesthetic enjoyment.  WWA staff and supporters seek to view wolves, black and grizzly bears, bison, elk, and other wildlife species in Grand Teton, including on the non-federal inholdings.

10.      The aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of plaintiffs and their members, staff, and volunteers have been, are being, and unless their requested relief is granted, will continue to be adversely and irreparably injured by the Park Service's arbitrary and unlawful conduct.  These are actual, concrete injuries that are traceable to the Park Service's conduct and would be redressed by the requested relief.  Plaintiffs have no adequate remedy at law.

11.      Defendant Sally Jewell is the United States Secretary of the Interior.  In that capacity, Secretary Jewell has supervisory responsibility over the National Park Service. Defendant Jewell is sued in her official capacity.

12.     Defendant Jonathan B. Jarvis is the Director of the National Park Service.  In that capacity, Director Jarvis has supervisory responsibility over all units of the National Park System, including Grand Teton National Park.  Defendant Jarvis is sued in his official capacity.

13.     Defendant Sue Masica is the Regional Director for the National Park Service's Intermountain Region.  In that capacity, Regional Director Masica has supervisory responsibility over all units of the National Park System in the Intermountain Region, including Grand Teton National Park.  Defendant Masica is sued in her official capacity.

## LEGAL AND FACTUAL BACKGROUND

## I.     THE NATIONAL PARK SYSTEM

14.     Our national parks have famously been described as America's best idea. Wallace Stegner, Marking the Sparrow's Fall 135 (1948).  The National Park System encompasses 409 areas of "superlative natural, historic, and recreation[al]" significance across the United States.  Nat'l Park Serv., Mgmt. Policies 2006 § 1.4.1 ("Mgmt. Policies").  Inclusion in the National Park System is a unique distinction among federally-protected lands, reserved for "only the most outstanding examples of the nation's natural and cultural resources."  Id. § 1.3.

15.     The Park Service manages the National Park System pursuant to the National Park Service Organic Act of 1916 ("Organic Act") and National Park Service General Authorities Act of 1970, as amended in 1978.  See id. § 1.4.1 (quoting 16 U.S.C. § 1a-1, recodified at 54 U.S.C. § 100101(b)(1)).  Consistent with the superlative character of the lands and waters constituting the National Park System, Congress directed the Park Service to manage National Parks "to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  54 U.S.C. § 100101(a).

16.     Accordingly, the Park Service's "primary responsibility" under the Organic Act is to "leave park resources and values"—including wildlife—"unimpaired unless a particular law directly and specifically provides otherwise."  Mgmt. Policies § 1.4.4; see also id. § 1.4.6; Greater Yellowstone Coal. v. Kempthorne, 577 F. Supp. 2d 183, 190 n.1 (D.D.C. 2008) (holding, consistent with Park Service's concession, that § 1.4 of the Management Policies "serves as [the Park Service's] official interpretation of the Organic Act and is therefore enforceable against [the Park Service]").  Further, Congress reserved to itself the exclusive authority to make exceptions from the statutory mandate to preserve national park resources for the unimpaired enjoyment of future generations.  See 54 U.S.C. § 100101(b)(2) (prohibiting activities "in derogation of the values and purposes for which the [National Park] System units have been established, except as directly and specifically provided by Congress"); Mgmt. Policies § 1.4.4 ("The impairment of park resources and values may not be allowed by the [Park] Service unless directly and specifically provided for by legislation or by the [congressional] proclamation establishing the park.").

17.     To implement its statutory duties, the Park Service has promulgated regulations at 36 C.F.R. Ch. 1 that govern the preservation and use of National Park resources.  The Park Service's wildlife-protection regulation, 36 C.F.R. § 2.2, prohibits (1) any hunting in a National Park unless specifically mandated or authorized by federal statute; (2) any wildlife trapping in a National Park unless specifically mandated by federal statute; and (3) any "feeding, touching, teasing, frightening or intentional disturbing of wildlife nesting, breeding or other activities" in a National Park.  Id. § 2.2(a)(1)-(2), (b)(1)-(3).

18.     The Park Service's wildlife-protection regulation, 36 C.F.R. § 2.2, superseded a prior rule that gave the Park Service discretion to authorize hunting and trapping in National

Park areas.  See Proposed Rule, Nat'l Park Serv., Gen. Regs. for Areas Administered by the

Nat'l Park Serv., 47 Fed. Reg. 11,598, 11,601 (March 17, 1982).  The Park Service promulgated

36 C.F.R. § 2.2 in response to amendments to the Organic Act in the 1970s that reflected

congressional disapproval of the existing patchwork of hunting and trapping authorizations in

National Parks and reinforced that Congress alone—not the Park Service—has discretion to

authorize activities such as wildlife taking that contravene the overriding preservation mandate

for the National Parks.  See Mich. United Conservation Clubs v. Lujan, 949 F.2d 202, 204-05

(6th Cir. 1991) (describing legislative and regulatory history).

19.     Though the Park Service's regulations generally "do not apply on non-federally

owned lands and waters or on Indian tribal trust lands located within National Park System

boundaries," 36 C.F.R. § 1.2(b), specified regulations—including the wildlife-protection

regulation, id. § 2.2—apply "regardless of land ownership, on all lands and waters within a park

area that are under the legislative jurisdiction of the United States," id. § 2.2(g).

## II.     GRAND TETON NATIONAL PARK

### A.     The Landscape and Wildlife of Grand Teton National Park

20.     Grand Teton National Park is considered one of the crown jewels of the National

Park System.  Situated in northwest Wyoming just south of Yellowstone National Park, Grand

Teton's 310,000 acres lie at the heart of the Greater Yellowstone Ecosystem, one of the few

nearly-intact temperate ecosystems remaining on Earth.  The iconic landscape of Grand Teton

National Park is characterized by the jagged peaks of the Teton Range, which rise more than

7,000 feet from the sagebrush floor of the Jackson Hole valley to glaciated heights exceeding

13,700 feet above sea level.

21.     Grand Teton National Park supports more than 1,000 species of native plants and serves as a refuge for numerous wildlife species, including moose, elk, mule deer, bison, pronghorn antelope, bighorn sheep, gray wolves, black and grizzly bears, mountain lions, wolverines, bald eagles, and sage grouse.  The Park provides essential habitat for multiple species protected under the federal Endangered Species Act, 16 U.S.C. § 1531, et seq., as well as safe passage for numerous migratory mammals and birds.  The Snake River, which flows for more than 25 miles through Grand Teton National Park, provides one of the last remaining natural habitats of the Snake River cutthroat trout.  Visitors travel from around the world to view and photograph the Park's spectacular wildlife species in their natural habitat and consistently identify wildlife viewing as the Park's primary attraction.

**B.     The Establishment of Grand Teton National Park**

22.     Congress established Grand Teton National Park "to protect the area's native plant and animal life and its spectacular scenic values, as characterized by the geologic features of the Teton Range and Jackson Hole."  Nat'l Park Serv., Rocky Mtn. Region, Statement for Mgmt., Grand Teton Nat'l Park 4 (Oct. 1989).  The original Park, encompassing about 96,000 acres but restricted to the Teton Range itself, was established by Congress in 1929.  Id.; see Pub. L. No. 70-817, 45 Stat. 1314 (1929).  Congress enlarged the Park to its present size by Act of September 14, 1950, which consolidated the Park with lower-elevation lands in the then-existing Jackson Hole National Monument that provide rich wildlife habitat.  See Pub. L. No. 81-787, 64 Stat. 849 (1950), codified at 16 U.S.C. §§ 406d-1 – 406d-5, 673c ("Grand Teton Enabling Act").

23.     Congress's establishment of the modern Grand Teton National Park in 1950 was the culmination of a historic compromise between the United States and the State of Wyoming. The Park Service's proposal to expand Grand Teton National Park beyond its original 96,000

acres engendered vehement opposition from Teton County and Wyoming interests concerning

loss of county tax revenue; curtailment of private land ownership in the Jackson Hole valley;

restriction of grazing privileges on the proposed new Park lands; and the prospect of federal

control of the Jackson Hole elk herd, which was then managed by the Wyoming Game and Fish

Department and open to public hunting.  See H. Rep. 81-2910, 81st Cong., 2nd Sess. (Aug. 11,

1950) (describing controversy).

24.     During negotiations over the Park expansion proposal between federal and state

representatives, control over the Jackson Hole elk herd and the extent of Wyoming's authority, if

any, to allow elk hunting within the expanded boundaries of Grand Teton National Park emerged

as the most contentious issue.  Wyoming demanded "[c]omplete jurisdiction and control over

elk" within Grand Teton National Park, "including the right to issue hunting licenses and

authority over hunting activities within the area."  Mem., L.G. Flannery to Sen. Mahoney (March

21, 1949).  However, the Park Service rejected that proposal on the ground that federal statutes

and regulations prohibited any hunting within National Park boundaries.

25.     To resolve the controversy with Wyoming and facilitate Park expansion, the

Interior Department made substantial concessions to Wyoming in negotiating the expansion of

Grand Teton National Park.  Congress ultimately embodied those concessions in the Grand

Teton Enabling Act, including a provision for federal reimbursement of lost county tax revenue,

16 U.S.C. § 406d-3, a provision preserving existing grazing rights on the expanded Park lands

for the life of the leaseholders and their heirs, id. § 406d-2, and a permanent prohibition on

establishment or expansion of any national parks or monuments in Wyoming without

congressional action, see § 1, 64 Stat. at 849.

26.     The Grand Teton Enabling Act also embodies the bargain negotiated by the Interior Department and Wyoming to settle the specific controversy surrounding management of the Jackson Hole elk herd, in the form of an exception from the general categorical prohibition against hunting in National Parks that provides for an "Elk Reduction Program" in which the Park Service and Wyoming would each play defined roles.  See 16 U.S.C. § 673c.  To effectuate this program, the statute authorizes issuance of limited elk-hunting licenses within designated areas of the Park, but only in specific years when the Park Service and Wyoming Game and Fish Commission jointly determine that reducing the elk population is "necessary for the purpose of proper management and protection of the elk."  Id. § 673c(a).  The asserted need for artificial culling of the Jackson Hole elk herd stems from an intensive federal and state management framework that involves artificial winter feeding of wild elk on the nearby Jackson Hole National Elk Refuge and public lands in the adjoining upper Gros Ventre River drainage, which sustains unnaturally high numbers of elk with unnaturally low over-winter mortality rates.  While maintaining that "any form of hunting [is] contrary to the basic national park concept, as well as the statutes enacted by the Congress for administration of the national park system," H.R. Rep. 81-2910, supra, at 3751 (statement of Interior Secretary Oscar Chapman), the Interior Department agreed to Wyoming's demand for an elk hunting authorization within park boundaries.  Although this authorization reflected an accommodation to Wyoming's desire for public hunting in the expanded park, its scope was nevertheless limited to the asserted wildlife-management needs arising from the "unique problem" posed by the Jackson Hole elk herd and its associated winter feeding program, id. at 3748, and even in that context was narrowly circumscribed to authorize elk hunting only when legitimately "necessary for the purpose of

proper management and protection of the elk" herd itself, 16 U.S.C. § 673c(a), and not for the

purpose of facilitating generalized recreational hunting.

27.     In exchange, the Interior Department secured a ban on any other hunting within

Grand Teton National Park.  Shortly after passage of the Grand Teton Enabling Act, Interior

Secretary Chapman confirmed in a letter to the Wyoming Game and Fish Commissioner, with

copies to the Wyoming governor and congressional delegation, that "[t]he act which established

the new Grand Teton National Park does not allow the hunting of any animal species at any time

or place within the boundaries, except elk within certain specified portions of the area and then

only after following certain preliminary procedures as described in Section 6 [16 U.S.C.

§ 673c]."  Letter from O. Chapman, U.S. Sec'y of the Interior, to L. Bagley, Wyo. Game & Fish

Comm'r (Oct. 4, 1950).  In this regard, Secretary Chapman noted that the "[o]ther laws which

are applicable to the administration of national parks, and which are not rendered inoperative by

any portion of the new Grand Teton act, are explicit in requiring protection of park wildlife."  Id.

## III.    THE GRAND TETON INHOLDINGS

28.     Embraced within the exterior boundaries of Grand Teton National Park are

approximately 2,300 acres of "inholdings"—parcels of land owned by private parties or the State

of Wyoming.  Some inholdings contain residences or other structures, but the majority of

inholdings acreage is undeveloped.

29.     There are currently more than 100 private inholdings in Grand Teton totaling

approximately 950 acres.  The largest private inholdings are Moose Head Ranch, a guest ranch

encompassing approximately 120 acres within Park boundaries; and Pinto Ranch, a commercial

cattle ranch of approximately 450 acres within Park boundaries.

30.     The State of Wyoming owns two inholdings within Grand Teton National Park, each of which comprises approximately 640 acres.  The State inholdings are held in trust for the primary benefit of Wyoming's public schools and managed by the Wyoming Office of State Land and Investments.  The State inholdings are generally indistinguishable from the surrounding National Park lands and are readily accessible by park wildlife.

31.     Collectively, the inholdings encompass important habitat for numerous wildlife species native to Grand Teton National Park, including grizzly bears, gray wolves, bison, elk, moose, mule deer, and pronghorn antelope.

32.     One of the State inholdings lies in Antelope Flats (the "Antelope Flats Tract"), an expanse of sagebrush habitat east of the Snake River that is an important grazing and migration area for wildlife, including elk, mule deer, moose, and pronghorn antelope.

33.     The second State inholding lies on the eastern edge of the Park near the community of Kelly, Wyoming, and the Gros Ventre River (the "Kelly Tract").  Encompassing varied habitat of deciduous forest and grassland, this area also is a significant migration corridor for wildlife, including elk and pronghorn antelope.  Approximately 400 pronghorn antelope in the Grand Teton herd must pass through this area to complete their 130-mile annual migration from the Upper Green River Valley to reach important summer habitat and foraging and calving grounds in Grand Teton National Park.  The Grand Teton pronghorn herd's approximately 260-mile roundtrip journey is one of the longest remaining migrations of any land mammal in the lower-48 United States and is essential to the herd's survival.

34.     The Kelly Tract lies near the Park's Gros Ventre Campground, which contains more than 370 public camping sites, as well as the Teton Science School, which children and adults visit for classroom and field classes.

**IV.    THE PARK SERVICE'S CESSION OF JURISDICTION OVER THE GRAND TETON INHOLDINGS**

35.    At the time the Grand Teton Enabling Act was negotiated in 1949, the existing Grand Teton National Park contained 930 acres of privately-owned inholdings and the adjacent Jackson Hole National Monument, from which the expanded Park's new acreage was drawn, contained 16,000 acres of private inholdings.  The Park Service and the State of Wyoming were aware of these inholdings but made no provision for their management distinct from the framework and authorities governing the federally owned lands in Grand Teton National Park.

36.    Until November 2014, the Park Service asserted jurisdiction to protect wildlife on Grand Teton inholdings and interpreted its wildlife-protection regulation, 36 C.F.R. § 2.2., to apply and prohibit taking or harassing of wildlife on the inholdings.

37.    In March 2012, the Wyoming Game and Fish Department asked the Park Service to reconsider its longstanding interpretation of 36 C.F.R. § 2.2.  This request coincided with a federal proposal to remove protections for gray wolves under the Endangered Species Act, which would transfer wolf-management authority on lands outside of Park Service jurisdiction to the State of Wyoming.

38.    Prior to November 2014, the Park Service repeatedly responded that its wildlife-protection regulation, 36 C.F.R. § 2.2., applies and prohibits taking of wildlife on inholdings in Grand Teton National Park.  For example, in response to Wyoming's proposal to manage gray wolves as "trophy game" animals subject to regulated hunting on Grand Teton inholdings, the Park Service stated in April 2012 that 36 C.F.R. § 2.2 applies "on all lands within the [national] park, regardless of land ownership" and would continue to prohibit state-authorized wolf hunting on the inholdings regardless of wolves' endangered-species status.  Letter from T. Whittington, Assoc. Reg'l Dir., Nat'l Park Serv., to S. Talbott, Dir., Wyo. Game and Fish Dep't (April 20,

2012).  Consistent with the Park Service's position, less than one month later Wyoming

Governor Matthew Mead sent a letter to the U.S. Fish and Wildlife Service conceding that

Wyoming "has no authority … to implement wolf hunting seasons within the jurisdictional

boundaries of Grand Teton National park."  Letter from Gov. M. Mead to U.S. Fish & Wildlife

Serv. 4 (May 15, 2012).  The U.S. Fish and Wildlife Service, another Interior Department

agency, adopted the Park Service's assertion that 36 C.F.R. § 2.2 protects wildlife on Grand

Teton inholdings in justifying an attempt to remove Endangered Species Act protections for

Wyoming wolves in 2012.  In response to pubic comments expressing "concern that Wyoming

claimed jurisdiction over private lands within Grand Teton National Park and might authorize

hunting within the park's boundaries," the Fish and Wildlife Service assured the public that, as

the Park Service had affirmed, 36 C.F.R. § 2.2 "makes clear that the hunting prohibition is

applicable on all lands within the park boundary, regardless of ownership," such that "taking of

wolves would not be allowed on any of the inholdings within the park."  Final Rule, U.S. Fish &

Wildlife Serv., Removal of the Gray Wolf in Wyo. from the Federal List of Endangered and

Threatened Wildlife, 77 Fed. Reg. 55,530, 55,560 (Sept. 10, 2012).

   39.  In January 2014, an individual shot and killed a gray wolf on a private inholding

within Grand Teton.  The United States Attorney for the District of Wyoming, to whom the Park

Service referred the incident for prosecution under 36 C.F.R. § 2.2, declined to prosecute based

in part on his conclusion that 36 C.F.R. § 2.2 does not apply on inholdings.

   40.  Nevertheless, in February 2014 the Park Service reaffirmed in a memorandum

addressed to Wyoming officials that killing wildlife on Park inholdings would violate 36 C.F.R.

§ 2.2.  Mem., Options and Alternatives for Addressing Livestock Depredation by Wolves on

Non-Federal Lands within Grand Teton National Park (revised Feb. 18, 2014).  The Park Service

asserted that any authorization of wildlife-taking within the boundaries of Grand Teton National

Park would be inconsistent with Park purposes and therefore prohibited by federal law.

Accordingly, the Park Service stated that it lacks legal authority to relinquish its jurisdiction to

protect wildlife on Park inholdings.

41.    However, in a November 2014 letter to the Wyoming Game and Fish Department,

the Park Service reversed its longstanding regulatory interpretation and asserted without

reasoning that 36 C.F.R. § 2.2 "does not apply to private inholdings within Grand Teton."

Whittington Letter 1.  As a consequence of its new regulatory interpretation, the Park Service

stated that it would thereafter defer to the Wyoming Game and Fish Department to manage

wildlife on the inholdings.  Id.

42.    In a December 22, 2014, internal agency briefing statement, the Park Service

acknowledged that it, along with the Wyoming Game and Fish Department, had "long operated

with the understanding that private inholdings within the park fall under the legislative

jurisdiction of the United States, and therefore that 36 C.F.R. 2.2 is applicable on those lands.

The implication of that is that the [Park Service] is responsible for the management of wildlife on

those lands, and that the taking of wildlife (wounding, killing, harassing, etc.) is prohibited."

Nat'l Park. Serv., Briefing Statement – Grand Teton Nat'l Park, Applicability of Certain Regs.

on Private Inholdings 1 (Dec. 22, 2014) ("Briefing Statement").

43.    In its briefing statement, the Park Service asserted that its jurisdiction under 36

C.F.R. § 2.2 extends only to non-federal lands within park boundaries "over which the State

ha[s] ceded either exclusive or concurrent jurisdiction to the United States."  Id.  The Park

Service stated that "Wyoming ceded concurrent jurisdiction [over Grand Teton National Park] to

the [Park Service] in 1977," id., in a statute that grants the United States "[c]oncurrent

jurisdiction over crimes and offenses under the laws of the state of Wyoming … over and within all the territory dedicated to national park, monument, historic site or public recreational purposes included in tracts of land in Wyoming designated as," inter alia, "Grand Teton National Park."  Wyo. Stat. Ann. § 5-1-108(a)(i) (1977).  In its briefing statement, the Park Service asserted that "[m]any of the private inholdings within the park are not dedicated to national park, monument, historic site, or public recreational purposes, therefore the regulations cannot apply." Briefing Statement, supra, at 2.

## V.      WYOMING HUNTING AND TRAPPING LAWS

44.      In response to the renunciation of federal wildlife-management jurisdiction announced in the Whittington Letter, the Wyoming Game and Fish Department stated that it will manage inholdings within Grand Teton National Park "like any other land that the state has jurisdiction over."  M. Koshmrl, State:  Hunting a go on park inholdings, Jackson Hole News & Guide (Sept. 9, 2015).

45.      In contrast to the federal statutory and regulatory authorities governing management of Grand Teton, Wyoming law does not provide protections for Park wildlife. Instead, on lands under the jurisdiction of the State of Wyoming—including, as a consequence of the Whittington Letter, Grand Teton inholdings—certain wildlife may be killed at any time without a permit or license.  Specifically, coyotes, jackrabbits, porcupines, raccoons, red foxes, skunks, and certain bird species may be killed in unlimited numbers, at any time, by any lawful means.  Wyo. Stat. Ann. § 23-3-103(a), 23-1-101(a)(vii)-(viii) (2015).  The Wyoming Game and Fish Commission may add to this list of species subject to unlimited taking.  See id. § 23-3-103(b).

46.     In addition, Wyoming law authorizes landowners and their lessees, employees, and agents to immediately kill any beaver, black bear, mountain lion, bobcat, weasel, badger, squirrel, or muskrat that is "causing damage" to property.  Id. § 23-3-114, 23-3-115(a).  In the event that Endangered Species Act protections are removed for Wyoming wolves, as the U.S. Fish and Wildlife Service and Wyoming are working to achieve, the same rule will apply to wolves.  See id. § 23-3-115(c).

47.     Wyoming law subjects other wildlife species to hunting and trapping pursuant to regulations promulgated by the Wyoming Game and Fish Commission.  See id. § 23-1-302. Under this authority, the Commission has discretion to authorize the taking of wild bison, black bears, mountain lions, antelope, bighorn sheep, deer, elk, moose, mountain goats, beavers, bobcats, martens, mink, muskrats, weasels, badgers, grouse, quail, sandhill cranes, cottontail rabbits, snowshoe hares, squirrels, and any migratory birds not protected under federal law.  See generally id. § 23-1-101.

48.     As a consequence of the Whittington Letter, the Wyoming Game and Fish Commission has discretion to authorize taking of these species on inholdings within Grand Teton National Park.  The Commission exercised that discretion in 2015 by authorizing deer hunting within the boundaries of Grand Teton National Park as well as elk hunting outside the auspices of the jointly administered federal-state elk reduction program authorized in the Grand Teton National Park Enabling Act.  Under the Commission's existing regulations, bison hunting also is permitted on Grand Teton inholdings.

49.     Although the Whittington Letter references only private inholdings, its rationale applies with equal force to the state inholdings within Grand Teton.  Accordingly, in 2015 the Wyoming Game and Fish Department began authorizing bison hunting on the state-owned

inholdings and, on information and belief, at least three bison have been killed by state-licensed hunters on the state inholdings to date.  On information and belief, the Park Service is aware of this state-authorized bison hunting and has not taken action to object to or prevent that activity.

50.     In the event that federal Endangered Species Act protections for grizzly bears or gray wolves are eliminated, those species also may be subject to hunting and trapping on Grand Teton inholdings as a consequence of the Whittington Letter.  See Wyo. Stat. Ann. § 23-1-101(a)(xii)(A)-(B).  On March 11, 2016, the U.S. Fish and Wildlife Service published a proposed rule to remove grizzly bears in the Greater Yellowstone Ecosystem, which includes Grand Teton National Park, from the list of species protected by the Endangered Species Act.  Proposed Rule, U.S. Fish & Wildlife Serv., Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears from the Federal List of Endangered and Threatened Wildlife, 81 Fed. Reg. 13,174 (March 11, 2016).  That proposal raises the prospect that grizzly bear hunting could be legalized on inholdings within Grand Teton National Park as early as this year.

51.     In sum, in the Whittington Letter the Park Service reversed a settled legal interpretation in place for more than sixty years that recognized federal authority to protect wildlife on all lands within Grand Teton National Park, regardless of ownership.  As a result of the agency's determination, wildlife species for which the National Park System provides a rare refuge from human persecution, including coyotes and foxes, are now subject to unregulated killing any time they enter private or state lands within the boundaries of Grand Teton National Park.  Additional species that find important foraging and migration habitat on Park inholdings and are prized by Park visitors, such as bison, are now subject to lethal taking through state-authorized hunting on these same lands.  And there is an obvious prospect that removal of Endangered Species Act protections for grizzly bears and wolves, which is actively being

pursued by federal officials, would subject these species as well to hunting mortality within the

boundaries of Grand Teton, one of our nation's most iconic National Parks.

## FIRST CLAIM FOR RELIEF
### (Violation of 36 C.F.R. § 2.2; 5 U.S.C. § 706(2)(A))

52.    Plaintiffs hereby reallege and reincorporate Paragraphs 1 through 51.

53.    The Park Service's wildlife-protection regulation, 36 C.F.R. § 2.2, prohibits any

taking or harassment of wildlife in National Parks except as expressly provided by federal

statute.  These prohibitions apply "regardless of land ownership, on all lands and waters within a

park area that are under the legislative jurisdiction of the United States."  Id. § 2.2(g) (emphasis

added).  As the Park Service's regulations describe, the emphasized language indicates that § 2.2

was "specifically written to be applicable on [non-federally owned] lands" within National Park

boundaries.  Id. § 1.2(b).

54.    The inholdings in Grand Teton National Park are within the legislative

jurisdiction of the United States and therefore subject to 36 C.F.R. § 2.2.  There are at least three

independent bases for the exercise of federal legislative jurisdiction over the inholdings.

55.    First, the United States acquired legislative jurisdiction over the Grand Teton

inholdings in negotiating the establishment of Grand Teton National Park with the State of

Wyoming in 1949-50.  The United States may acquire legislative jurisdiction over land within a

state by the state's cession of concurrent or exclusive jurisdiction.  United States v. Bohn, 622

F.3d 1129, 1133 n.3 (9th Cir. 2010); see also Final Rule, Nat'l Park Serv., General Regulations

for Areas Administered by the Nat'l Park Serv., 48 Fed. Reg. 30,252, 30,253 (June 30, 1983)

(Park Service explaining that lands "over which a State has ceded police powers to the United

States" fall within the federal legislative jurisdiction).  In the course of the federal-state

negotiations concerning establishment of the expanded Grand Teton National Park, Wyoming

accepted the federal government's refusal to grant the State exclusive management authority

over elk within the boundaries of Grand Teton National Park and instead agreed to the Grand

Teton Enabling Act's provision for limited elk hunting pursuant to a jointly administered federal-

state Elk Reduction Program, which requires an annual decision that such hunting is legitimately

necessary for the "management and protection" of the elk herd.  As part of this resolution of

competing federal and state interests, Wyoming agreed to a statutory framework that prohibits

wildlife taking within the National Park boundaries with the sole exception of the Elk Reduction

Program.  Wyoming's "active participation in the creation" of Grand Teton National Park "with

the knowledge that Congress intended that hunting would be prohibited throughout the park"

except as part of the Elk Reduction Program "was tantamount to a cession of jurisdiction over

the lands and waters within the park boundaries."  United States v. Brown, 552 F.2d 817, 821

(8th Cir. 1977) (holding that Minnesota implicitly ceded jurisdiction over non-federal waters

within Voyageurs National Park by participating in the park's creation with knowledge that the

federal government intended to prohibit hunting there).

56.    Second, Wyoming ceded legislative jurisdiction over Grand Teton inholdings to

the United States by state statute in 1977.  That statute provides that "[c]oncurrent jurisdiction

over crimes and offenses under the laws of the state of Wyoming is hereby ceded to the United

States over and within all the territory dedicated to national park, monument, historic site or

public recreational purposes included in tracts of land in Wyoming designated as," inter alia,

"Grand Teton National Park."  Wyo. Stat. Ann. § 5-1-108(a)(i); see also Notice, Concurrent

Jurisdiction Accepted, 42 Fed. Reg. 46,421 (Sept. 15, 1977) (federal government's formal

acceptance of jurisdiction).  This express cession of concurrent jurisdiction over the territory

within Grand Teton National Park gives rise to federal legislative jurisdiction.  See 36 C.F.R.

§ 1.4(a) (defining lands within federal "legislative jurisdiction" as those lands "under the exclusive or concurrent jurisdiction of the United States"); 48 Fed. Reg. at 30,253 (Park Service explaining that lands "over which a State has ceded police powers to the United States" fall within federal legislative jurisdiction). Because this cession is not limited by its terms to federally-owned lands, it applies to the inholdings. See Petersen v. United States, 191 F.2d 154, 155-56 & n.1 (9th Cir. 1951) (interpreting substantially identical language in Kings Canyon National Park enabling legislation to effectuate cession of legislative jurisdiction to United States); Report of the Interdepartmental Cmte. For the Study of Jurisdiction Over Federal Areas Within the States 75 (June 1957) ("Interdepartmental Committee Report") (stating that federal legislative jurisdiction acquired pursuant to state cession statute will extend to privately owned land within National Park boundaries unless "the State's cession statute limits cession to lands owned by the [federal] Government") (citation omitted); see 48 Fed. Reg. at 30,261 (Park Service citing Interdepartmental Committee Report as source for agency's definition of "legislative jurisdiction" in 36 C.F.R. § 2.2).

57.     Third, the United States possesses federal legislative jurisdiction over Grand Teton inholdings pursuant to the Property Clause, U.S. Const. art. IV, § 3, cl. 2, which empowers Congress and the agencies to which it delegates authority to make any "'needful' rules 'respecting' the public lands." Kleppe v. New Mexico, 426 U.S. 529, 539 (1976). This federal power, which does not depend on any cession of authority by the state in which federal lands lie, extends to the regulation and protection of wildlife living on federal public lands and reaches beyond the boundaries of federal property when necessary to effectuate federal purposes. See id. at 538-39, 540-43, 546; Brown, 552 F.2d at 821-22 & n.5.   The exercise of federal jurisdiction over Grand Teton inholdings, which are utilized by and contain important habitat for numerous

wildlife species that move freely between the inholdings and adjacent National Park lands, is necessary to effectuate the National Park's "fundamental purpose" of conserving resident wildlife.  54 U.S.C. § 100101(a).

58.     Accordingly, the Park Service's assertion that its wildlife-protection regulation, 36 C.F.R. § 2.2, "cannot apply" on Grand Teton inholdings, Briefing Statement 2, is arbitrary and unsupported.

59.     Further, the Park Service lacks discretion to interpret its wildlife-protection authorities more narrowly than Congress has permitted.  See 54 U.S.C. § 100101(a), (b)(2); Mgmt. Policies § 1.4.2 (acknowledging that Organic Act imposes on Park Service "an absolute duty, which is not to be compromised, to fulfill the mandate of the 1916 Act to take whatever actions and seek whatever relief as will safeguard the units of the national park system") (quotation omitted); id. § 1.4.3 (under Organic Act, Park Service "must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values").

60.     The Park Service's determination in the Whittington Letter that it lacks jurisdiction to protect wildlife on Grand Teton inholdings is arbitrary and violates the language and purpose of the agency's wildlife-protection regulation, 36 C.F.R. § 2.2.

## SECOND CLAIM FOR RELIEF
**(Violation of National Park Service Organic Act, 54 U.S.C. § 100101, et seq., and Grand Teton National Park Enabling Act, 16 U.S.C. §§ 406d-1 – 406d-5, 673c; 5 U.S.C. § 706(2)(A))**

61.     Plaintiffs hereby reallege and reincorporate Paragraphs 1 through 60.

62.     The Park Service's determination in the Whittington Letter to no longer enforce 36 C.F.R. § 2.2 on Grand Teton inholdings and its recognition of the State of Wyoming as the primary authority over wildlife on the inholdings also violates the agency's Organic Act, 54

U.S.C. § 100101, and the Grand Teton National Park Enabling Act, 16 U.S.C. §§ 406d-1, 673c,
by opening the inholdings to wildlife taking that Congress has not authorized.

63.     The Park Service's management of all units in the National Park System,
including Grand Teton National Park, must conform to the mandates of the Organic Act.  54
U.S.C. § 100101(a); 16 U.S.C. § 406d-1.

64.     The Organic Act establishes wildlife conservation as a "fundamental purpose" of
the National Park System.  54 U.S.C. § 100101(a).  Accordingly, as the Park Service has long
recognized, "Congress did not regard the National Park System to be compatible with
consumptive uses" such as the hunting, trapping, and other forms of wildlife killing authorized
under Wyoming law.  Mich. United Conservation Clubs, 949 F.2d at 207; see also Brown, 552
F.2d 817 (Park Service enforcing wildlife-protection regulation on non-federal waters within
Voyageurs National Park); Nat'l Rifle Ass'n v. Potter, 628 F. Supp. 903 (D.D.C. 1986) (Park
Service defending wildlife-protection regulation against facial challenge).

65.     The Organic Act prohibits the Park Service from authorizing any activities "in
derogation of the values and purposes for which the [National Park] System units have been
established"—including the killing or harassing of wildlife—"except as directly and specifically
provided by Congress."  54 U.S.C. § 100101(b)(2); see Mich. United Conservation Clubs, 949
F.2d at 207 (Park Service's "primary management function with respect to wildlife is
preservation unless Congress has declared otherwise").

66.     Neither the Organic Act nor the Grand Teton National Park Enabling Act permits
state-regulated hunting or trapping within the boundaries of Grand Teton National Park.  To the
contrary, the only public wildlife taking authorized by either statute is a limited elk hunt when
"necessary" to "insure the permanent conservation of the elk within the Grand Teton National

Park," which must be authorized by the Secretary of the Interior and carried out in conformance with federal statutory requirements.  16 U.S.C. § 673c(a)-(b).

67.     In the Whittington Letter, the Park Service deviated from this statutory direction by acknowledging the State of Wyoming as the primary wildlife-management authority on inholdings within Grand Teton National Park, thereby opening those areas to wildlife-taking pursuant to Wyoming law.

68.     The Park Service's cession of wildlife-management jurisdiction on Grand Teton inholdings to the State of Wyoming, as articulated in the Whittington Letter, violates the Park Service Organic Act, 54 U.S.C. § 100101, and Grand Teton National Park Enabling Act, 16 U.S.C. §§ 406d-1, 673c, by allowing wildlife taking within National Park boundaries that is not authorized by federal statute.

## REQUEST FOR RELIEF

Therefore, plaintiffs respectfully request that this Court:

69.     Declare that the Park Service's determination in the Whittington Letter that 36 C.F.R. § 2.2 does not apply on non-federal inholdings within Grand Teton National Park is arbitrary, capricious, an abuse of discretion, and contrary to law, and that 36 C.F.R. § 2.2 does apply on Grand Teton inholdings;

70.     Declare that the Park Service violated the National Park Service Organic Act, 54 U.S.C. § 100101, and the Grand Teton Enabling Act, 16 U.S.C. §§ 406d-1, 673c, by determining in the Whittington Letter that the State of Wyoming has primary authority over wildlife on non-federal inholdings within Grand Teton National Park and thereby permitting the taking of wildlife on Grand Teton inholdings pursuant to Wyoming law;

71.     Set aside the Park Service's determination, articulated in the Whittington Letter, that it lacks jurisdiction to protect wildlife on non-federal inholdings in Grand Teton National Park;

72.     Enjoin the Park Service from further implementing the determination articulated in the Whittington Letter that Wyoming possesses regulatory jurisdiction over wildlife on Grand Teton inholdings;

73.     Award plaintiffs their reasonable costs, fees, and expenses, including attorneys fees, associated with this litigation; and

74.     Grant plaintiffs such further relief as the Court may deem just and proper, including, if necessary, preliminary and permanent injunctive relief.


        Respectfully submitted this 23rd day of March, 2016.


                              /s/Timothy J. Preso
                             Timothy J. Preso (D.C. Bar No. 456531)
                             Katherine K. O'Brien (*pro hac vice application pending*)
                             Earthjustice
                             313 East Main Street
                             Bozeman, Montana 59715
                             (406) 586-9699 | Phone
                             (406) 586-9695 | Fax
                             tpreso@earthjustice.org
                             kobrien@earthjustice.org

                             *Counsel for Plaintiffs*

25